PRATHER and others *v.* KEAN and others.

*(Circuit Court, N. D. Illinois.* January 3, 1887.)

1. BANKS—THEFT OF BONDS DEPOSITED—SPECIAL DEPOSIT—USED FOR COLLATERALS—LIABLE AS PLEDGEES.

Plaintiffs, bankers, deposited with defendants, other bankers, certain government bonds as a special deposit. They afterwards asked defendants "to discount for them up to par of the bonds as collateral." On this loan being paid, defendants asked what they should do with the collaterals, and, being directed to hold them as formerly for plaintiffs' use, replied, "We hold $12,000 U. S. 4%, as special deposit;" and that they held them subject to plaintiffs' further orders. The two banks were in uninterrupted business relation for 10 years. The plaintiffs informed defendants that they wished, from time to time, to overdraw their account on the security of these bonds as collaterals, and plaintiffs, from time to time, made overdrafts on defendants, which were paid. The bonds were afterwards stolen by defendants' assistant cashier. *Held,* defendants' liability was that of pledgees.

2. SAME—DEFAULTING CASHIER—WARNINGS—GROSS NEGLIGENCE.

In this case it was shown that plaintiffs' bonds were kept in the "treasury" part of defendants' bank safe, where the securities and reserve or surplus funds, not in active use, were kept; that Ker, the defaulting assistant cashier, had access thereto; that defendants examined their cash and counted their securities every month, and examined their special deposits twice a year, to see that they corresponded with the amounts marked on the envelopes, and were otherwise correct; that the collaterals and special deposits were kept together; that no record of the number of bonds held on special deposit was kept, and they could not be counted and checked off. More than a year before Ker fled, defendants were warned that some one in their bank was speculating on the board of trade, of which Ker was accused, and admitted the fact, and on promising not to do so again, was retained in his position. Two months before Ker fled, defendants were again warned, and commenced an examination of their books and securities, but made no effort to see whether the special deposits were disturbed, because, as defendants testified, no record was kept of them by numbers or otherwise, although the numbers of plaintiffs' bonds did appear on defendants' bond register, having been sold by them to plaintiffs. *Held,* defendants were guilty of gross negligence in not discharging Ker, or placing him in a position of less responsibility, and were liable for bonds belonging to plaintiffs, stolen by him, whether such were held by them at law or special deposit.

At Law.

*H. W. Jackson* and *Robert Hervey,* for plaintiffs.
*John P. Wilson* and *O. H. Horton,* for defendants.

GRESHAM, J. The plaintiffs, who were bankers at Marysville, Missouri, opened an account in 1873 with the defendants, who were bankers at Chicago, and this relation continued until the spring of 1883. Interest was allowed the plaintiffs on their deposits above a certain amount, at the rate of 2½ and 3 per cent. per annum, and the deposits averaged from $200,000 to $400,000 a year. On July 7, 1880, the defendants sold to the plaintiffs $12,000 of 4 per cent. government bonds, for which the latter paid, including premium and accrued interest, $13,005. The letter which the plaintiffs wrote ordering the purchase concluded thus: "You will please send us description and numbers of the bonds, and hold same as special deposit for us." In the account which the defendants rendered to the plaintiffs of the purchase, the latter were informed

that the bonds were held as a special deposit, subject to their order. The numbers of these bonds appeared upon the bond register which the defendants kept, and they remained in their custody until some time between November, 1881, and November, 1882, during which period they were stolen by their assistant manager, Ker, who disappeared on January 16, 1883, and this suit is brought to recover their value.

On October 8, 1880, the plaintiffs wrote to the defendants: "Would it be convenient for you to discount for us, say, up to par of our bonds with you as collateral, and, if so, at what rate?" and in reply to this, on October 11th, the defendants said: "We will discount for you with pleasure, taking your government bonds at par as collateral." On December 22d the defendants discounted plaintiffs' note for $12,000, and on the same day notified them that the bonds were held as collateral security for the loan. This note was renewed, and when it became due, on April 27, 1881, the defendants wrote the plaintiffs: "We debit you $12,000 for your note due to-day, which please find inclosed, canceled. What disposition shall we make of the collaterals?" The answer to this letter was not produced; but Robinson, one of the plaintiffs, testified that he directed the defendants to "hold the bonds, as formerly, for our [plaintiffs'] use," and to furnish a list of them, giving numbers. On May 5th the defendants wrote to the plaintiffs: "Your favor of the second inst. at hand. We hold $12,000 U. S. 4%, as special deposit;" giving the numbers, and informing the plaintiffs the bonds were held subject to their further orders. On October 11, 1882, the defendants discounted the plaintiffs' note for $10,000, at 60 days, receiving as collateral security therefor a number of notes given to the plaintiffs by their customers. This note was paid at maturity, and the collaterals returned.

Robinson testified that, in a letter which he wrote to the defendants asking for the last loan, he informed them the plaintiffs preferred giving the notes of their customers in place of the bonds as collateral, as they wished to use the bonds in case of emergency. He also stated that after the purchase of the bonds, the plaintiffs had overdrawn their account from time to time, and that their overdrafts had been honored. On November 24, 1880, the plaintiffs wrote to the defendants: "We are carrying a large amount of hogs and cattle at this time for our customers, and we shall wish to overdraw our account for a small amount, and we will thank you to honor the same, and will consider our bonds in your hands as security for the same. We do not wish to overdraw, but stock may be detained on the road;" and two days later the defendants replied: "Yours of the twenty-fourth inst. received. In reply, we beg to say, should you have occasion to check on us as you suggest, we will pay your checks with great pleasure."

Robinson testified that on January 16, 1883, he wrote to the defendants asking for another loan of $10,000 on the notes of their customers, as the plaintiffs wished to keep the bonds for emergencies, meaning to meet overdrafts as previously. On January 29th the defendants replied to this letter, apologizing for the delay which had occurred through oversight on the part of their corresponding clerk, saying: "We telegraphed

you to-day that it is all right, meaning to say that your request for dis-
count is granted." If the defendants did not know when they wrote
this letter that Ker had stolen the bonds, they had abundant reason for
believing he had. On March 5, 1883, the defendants wrote to the plain-
tiffs: "Do your books show that you should have a special deposit of
government bonds with us; if so, what issue of bonds, and what
amount?" to which the plaintiffs replied, on March 8th: "We refer you
to your advice of July 7, 1880, in regard to our bonds held by you."

Kean, one of the defendants, told Robinson in July, 1883, so the lat-
ter testified, that he (Kean) did not know until about the middle of Jan-
uary of that year that Ker had stolen the bonds. At the time the
plaintiffs demanded the bonds, or their equivalent, there was nothing
due from them to the defendants; and the latter refused to comply with
the demand on the sole ground that the bonds were held as a special de-
posit, without reward, and that they were not liable for their loss.

Ker acted as book-keeper for about 10 years previous to May, 1881,
when he became assistant cashier, at a salary of $2,000 a year. The
plaintiffs' bonds were kept in the "treasury" part of the safe, where the
securities and reserve or surplus funds, not in active use, were kept.
Ker took $21,500 of the defendants' funds, and $35,000 in bonds, in-
cluding those sued for. Kean also testified that he did not know when
the plaintiffs' bonds were last seen in the vault; that it was their habit
to examine their securities and count their cash every month, and to ex-
amine their special deposits twice a year, to see that they corresponded
with the amounts marked on the envelopes, and were otherwise correct;
that the collaterals and special deposits were kept together; that Ker
took none of the collaterals, presumably because he was aware of the
habit of the bank to examine them and the cash; and that no record of
the numbers of bonds held on special deposit was kept, and they could
not be counted and checked off.

More than a year before Ker left, the defendants were cautioned that
some one in their bank was speculating on the board of trade. Kean
testified that, after receiving this caution, he made a quiet investigation,
and the facts pointed towards Ker, if any one; that he thereupon called
Ker up, and accused him of having been so speculating, to which he re-
plied, "I have made a few transactions, but I am not doing anything
now, and do not propose to do anything more." He admitted that what
he had done was against the rules of the bank, and said: "I know I
ought not to do it, and I am not going to do any more of it. I am ahead
a thousand dollars, all told." Ker's salary appears to have been his only
income. The defendants do not claim that he had accumulated any
means or property from this or any other source, or that they thought
he had; and yet they retained him in his position, which afforded him
access to their own assets as well as the securities of others, without mak-
ing any effort to verify the truth of his statements, or ascertain whether
he had been tempted to appropriate to his own use the property of others.

About two months before he left, Preston, one of the defendants,
residing at Detroit, wrote to the bank at Chicago, calling attention to

reported speculations of some of the employes on the board of trade, suggesting inquiry upon the subject, and directing that a careful examination be made of their securities of all kinds. On receipt of this letter, Kean told Ker what he had heard, and asked if he had not been speculating again on the board of trade? Ker said he had made some deals for friends in Canada for which he had received a brokerage, and that the transactions were all ended. The defendants then seemed to entertain suspicion of Ker's integrity, and an examination of their books and securities was commenced. No effort was made, however, to see whether the special deposits had been disturbed. Kean testified that the special deposits, including the plaintiffs' bonds, were not examined, because no record was kept of them, by numbers or otherwise; although the proof shows that the numbers of the plaintiffs' bonds did appear upon the defendants' bond register at the time of the purchase.

If the bonds were held as collateral security at the time they were stolen, the defendants were obliged, as bailees for reward, to exercise that degree of care in their safe-keeping which a reasonably prudent and cautious man would exercise in the care of his own property of the same kind. It does not follow that they are not liable if they were as diligent in caring for these bonds as they were in caring for securities of their own, for they may have been careless of the latter. If, however, the custody of the defendants at the time the bonds were stolen was only that of gratuitous bailees, for safe-keeping, they are not liable for the loss unless it resulted from their gross carelessness. *National Bank* v. *Graham*, 100 U. S. 699.

When the first loan for which the bonds were pledged as security was paid, and the defendants inquired what should be done with the collaterals, they were directed by the plaintiffs to hold them as formerly, for the plaintiffs' use, and forward a list of them by numbers. The direction was not that the bonds be held as a special deposit, or for safe-keeping. Evidently the defendants were informed that the plaintiffs expected to use the bonds as they had already been used, namely, as collaterals; and in informing the plaintiffs that the bonds were held as a special deposit, subject to their further orders, the defendants doubtless intended to be understood as willing to hold the bonds as collateral security for future loans. The two banks had been in uninterrupted business relations for a number of years, during the greater portion of which time there was a balance, varying in amount, with the defendants in favor of the plaintiffs. The defendants deemed this account desirable and valuable. They cut off the coupons as they matured, and placed the amount to the plaintiffs' credit. While, therefore, the bailment was for the convenience of the plaintiffs, it came about in the course of business between the two banks, and it was for their mutual benefit.

If it be conceded, however, that the bonds ceased to be held as collaterals when the $12,000 note was paid, and they thereupon became a mere special deposit, the character of the bailment was changed by the subsequent agreement whereby they remained in the custody of the defendants as a continuing security for advances made and to be made to

the plaintiffs. The defendants were distinctly informed that in order to accommodate, on short notice, such of the plaintiff's customers as were dealing in cattle and hogs, they might, from time to time, desire to overdraw their account on the security of these bonds as collaterals; and, in order that they might be held for such emergencies, the defendants discounted paper executed by the plaintiffs on the pledge of notes of the latter's customers. The evidence shows that this agreement continued in force until Ker fled, and that after it was made the plaintiffs did make overdrafts on the defendants, all of which were paid, some of them only a few months before Ker's dishonesty was discovered. If these overdrafts were not paid on the security of the bonds, they were paid without security, which is not to be presumed, in the absence of proof. The defendants made frequent examinations to see that their own cash and securities were correct, but, according to their own testimony, neglected any examination with a view of ascertaining whether or not the plaintiffs' bonds had been disturbed. The right of the defendants to hold the bonds against the plaintiffs and all others, as collateral security for any balance due to them from the plaintiffs, is too plain for dispute; and it follows that, having this right, their responsibility was that of pledgees.

It is immaterial, however, whether the defendants were bailees with or without reward, as in either case they are liable for the value of the bonds, the loss having resulted from their gross negligence. The defendants knew that Ker had been engaged in business which was hazardous, and that his means were scant. The demoralizing effect of speculating in stocks and grain—more properly speaking, gambling on the rise and fall of the price of stocks and grain—is seen in the numerous peculations, embezzlements, forgeries, and thefts plainly traceable to that cause. Ker had free access to valuable securities, which were transferable by delivery, easily abstracted and converted; and yet he was allowed to retain his position without any effort to see that he had not converted to his own use the property of others, or that his statements were correct. A prompt examination, after his first admission that he had been speculating, would have doubtless shown that even then some of the plaintiffs' bonds had been exchanged for others, if, indeed, they had not been stolen. Ker's position was one of trust and great importance. His own admission showed that he was not trustworthy for such employment, and it was gross negligence in the defendants not to discharge him, or place him in some position of less responsibility. *Scott* v. *National Bank*, 72 Pa. St. 471; *Third Nat. Bank* v. *Boyd*, 44 Md. 47; *Cutting* v. *Marlor*, 78 N. Y. 454.