CHARLES LYONS, Receiver, Appellant, v. JOHN C. CORDER et al.

In Banc, December 24, 1913.

1. **EVIDENCE: Records of Correspondent Bank.** In a suit against the directors of a bank to recover losses occasioned by the peculations of its cashier, in drawing drafts in his own favor on other banks in amounts in excess of what the bank's books and records showed to be the amount of such drafts, entries contained in the books of the bank's correspondents, showing the amounts paid by them on the drafts drawn on them by the bank's cashier, if original entries, made in the usual course of business and as a part of the duties of the correspondent's employee and at the time the drafts were presented for payment, are competent evidence, of independent probative force, of the amounts for which the drafts were drawn when they reached the correspondent and that were paid on them. Likewise the testimony of the employees who made the original entries is competent, for the same purpose.

2. **BANK DIRECTORS: Duties and Powers.** The control, supervision and conduct of the business of a bank is lodged in its board of directors as a collective body. They are not officers and have no power individually to control its management; to do that, they must act as a board, in which capacity they have plenary power to act for the bank, subject to the limitations of its charter and the rights of its stockholders. They are trustees of the bank's assets, but for the benefit of the bank and its stockholders, and are vested with full power of selection and appointment of officers and agents to conduct its affairs, and are required to exercise ordinary care and reasonable diligence to prevent loss to the bank from the misconduct of its cashier.

3. ———: ———: **Degree of Diligence.** The degree of diligence imposed by law upon the directors of a bank to discover thefts and peculations of its cashier and other officers is discussed in two opinions in this case, but a majority of the court do not agree to either; but a majority do agree that, under the facts in judgment, the directors were liable, in a suit by the receiver of the bank, for the moneys appropriated by

its cashier, and that the action of the trial court in granting a new trial to the defendants on the ground that "the verdict is against the weight of the evidence" was wrong and the judgment should be reinstated.

4. ————: **Liability for Cashier's Defalcations: No Bond: No Examination of Reconcilement Sheets.** During the time defendants were directors of the bank its cashier was engaged in gambling deals with keepers of bucket-shops; to get money for this purpose he appropriated the funds of the bank by overdrafts of his personal account, and by making fraudulent drafts upon its correspondents or depository banks in other cities; he did this by noting on the register book of his bank that drafts had been drawn on one of these correspondents for small sums, and by filling out the drafts for large amounts; when the drafts were paid he appropriated to his own use the excess of the amounts paid over and above the amounts shown by the bank's books for which they had been drawn; his misappropriations amounted to more than the bank's receiver obtained judgment for in this suit against the directors, and the aggregate of his embezzlements is undisputed; the directors did not at their monthly meetings examine the state of the cashier's personal account, and did not cause to be submitted to them, or to a committee appointed by them, the monthly return statements, called "reconcilement sheets," made to the bank by its correspondent banks, which showed the amounts they had paid out during each month upon the drafts drawn upon them by the cashier, and had they done so such examination and comparison would have revealed the cashier's embezzlement; and the directors did not require the cashier to give the bond required by Sec. 1112, R. S. 1909. *Held*, that the directors were liable for the losses to the bank caused by the cashier's peculations, and a verdict against them in favor of the bank's receiver should not have been set aside on the ground that "the verdict is against the weight of the evidence," but the judgment should be reinstated.

5. **NEW TRIAL: Verdict Against Weight of Evidence: Discretionary Power.** Where the trial judge exercises his discretionary power of setting aside a verdict and granting a new trial on the ground that "the said verdict is against the weight of the evidence," his action in so doing will not be reversed by the appellate court except where it is manifest that no judgment in favor of the party to whom the new trial is granted would be allowed to stand. And in this case a consideration of the undisputed evidence demonstrates that no verdict in favor of the bank directors, in a suit by its receiver to compel them to reimburse the bank for moneys appropriated by its cashier, could be permitted to stand, and the verdict returned by the jury is reinstated.

Appeal from Lafayette Circuit Court.—*Hon. Samuel Davis*, Judge.

REVERSED AND REMANDED (*with directions*).

*Horace F. Blackwell* and *Alexander Graves* for appellant.

(1) The directors were guilty of negligence *per se* in failing to require an official bond of the cashier. This conduct was in direct violation of law. (2) The directors cannot be heard to say they were not apprised of facts shown to exist by the ledgers, books, accounts, correspondence, reconcilements and statements of the bank which would have come to their knowledge except for their gross neglect or inattention. Hall v. Henderson, 61 L. R. A. 640, 126 Ala. 449; Society of Shakers v. Underwood, 15 Am. Rep. 737, 9 Bush, 609; Regan v. Bank, 61 N. E. 575. (3) The law conclusively presumes that a director knows all these things (even though in fact he be ignorant), including the state of the cashier's account and the bank's condition "and that it was his duty to have such knowledge and he cannot be allowed to plead ignorance and innocence as against the interests of the bank, its stockholders and creditors. Such would be against both morals and law." Bank v. Wulfekuhler, 19 Kan. 63; Marshall v. Bank, 17 Am. St, (Va.) 86; Elliott v. Bank, 57 S. E. (W. Va.) 242; Campbell v. Watson, 50 Atl. 125. (4) It is immaterial that the directors got no salary. Williams v. McKay, 40 N. J. Eq. 189, 53 Am. Rep. 776; Marshall v. Bank, 17 Am. St. (Va.) 92; Hun v. Cary, 82 N. Y. 73; Warner v. Robinson, 75 Am. St. 739; Thompson on Corporations, sec. 4108; Bank v. Hill, 148 Mo. 392; Stone v. Rottman, 183 Mo. 597; Martin v. Webb, 110 U. S. 52. (5) The evidence shows that directors Bray and John Corder had actual knowledge that the cashier was an option gambler; and, as his

gambling was notorious in the little village of Waverly, the jury was right in finding that all the directors knew the same thing. Conover v. Berdine, 69 Mo. 126; Dickenson v. Crisman, 28 Mo. 139; Bensoit v. Darby, 12 Mo. 206; Stephenson v. Kilpatrick, 116 Mo. 268. (6) All books of original entries used on the trial of the case were fair on their face and were shown to have been accurately kept and written up daily in the usual course of the business to which they pertain and were therefore competent, and sufficient evidence, in connection with the oral evidence adduced to the jury, to support the verdict. Milling Co. v. Walsh, 108 Mo. 277; Robinson v. Smith, 111 Mo. 205; Seligman v. Rogers, 113 Mo. 642; 1 Greenleaf on Ev. (15 Ed.), sec. 115. (7) Plaintiff's evidence showed conclusively that from April, 1904, to April, 1905, the directors permitted Cashier Lewis to overdraw his personal account $6657.95; and during the same time, discarding drafts numbered 4538 and 4894, named in the petition but unsupported by the evidence, he stole of the bank's funds deposited with its two correspondents $35,847.91, aggregating $42,505.86 for which the jury would have been justified in rendering a verdict. Wherefore, we submit that the judgment ought to be reversed and cause remanded with directions to render judgment on the verdict.

*W. H. Chiles, William Aull, D. D. Duggins* and *W. M. Williams* for respondents.

(1) This court will not interfere with the action of the trial court in granting a new trial on the ground that the verdict was against the weight of the evidence. Garneau v. Herthel, 15 Mo. 191; McCarty v. Transit Co., 192 Mo. 402; Fitzjohn v. Transit Co., 183 Mo. 78; Casey v. Transit Co., 186 Mo. 232; Foley v. Harrison, 232 Mo. 507; McKay v. Underwood, 47 Mo. 187; Reid v. Cox, 58 Mo. 429; Smoot v. Kansas City, 194 Mo. 532;

Johnson v. Grayson, 230 Mo. 393.  (2)  Power to make
by-laws for corporations, including banks, vested solely
in shareholders.  Carroll v. Bank, 8 Mo. App. 249;
Trust Co. v. Lumber Co., 118 Mo. 457; Klix v. St.
Stanlaus Parish, 137 Mo. App. 358.  (3)  The case of
Society of Shakers v. Underwood, cited by appellant,
is not regarded as sound law.  Thompson on Lia-
bility of Officers, p. 381; 13 Am. Law Reg. (N. S.) 218,
and notes—held by Redfield to be unsound.  (4)  The
respondent directors are not liable under the evidence
and the law.  The cases cited by appellant in Point
3 including Savings Bank v. Wulfenkuhler and Mar-
shall v. Farmers Bank combatted and distinguished:
Briggs v. Spaulding, 141 U. S. 132; Mason v. Moore,
76 N. E. (Ohio) 932; Current Law, p. 360; Stone v.
Rottman, 183 Mo. 572; Wakeman v. Bailey, 51 N. Y.
32; Daugherty v. Poundstone, 120 Mo. App. 309; Bank
v. Hill, 148 Mo. 380; Utley v. Bank, 155 Mo. 264;
Swentzel v. Bank, 15 L. R. A. 315; Spering's Appeal,
71 Pa. St. 11; Maisch v. Savings Fund, 5 Phila. 30;
In re Dean Coal Co., L. R. 10 Ch. 450-51; Manhattan
Co. v. Lydig, 4 Johns. 389; Turquand v. Marshall, L.
R. 4 Ch. 382; Dunn v. Kyle, 77 Ky. 134; Brannin v.
Loving, 82 Ky. 370; Warfield v. Clark, 91 N. W. (Iowa)
833; Zane on Banks and Banking, 122; Jones v. John-
son, 86 Ky. 530.  (5)  The case of Williams v. Mc-
Kay, cited by appellant, is discussed and distinguished
in Fusz v. Spaunhorst, 67 Mo. 264.  (6)  For complete
quotation of remarks of HARLAN, J., in Martin v. Webb,
a portion of which were omitted by appellant, see
Martin v. Webb, 110 U. S. 1. c. 15.  (7)  Statutory re-
quirements of board of directors.  R. S. 1899, sec.
1281; R. S. 1909, sec. 1099.  (8)  The books of Me-
chanics National Bank and Union National Bank and
the entries therein were not competent evidence in this
case.  Hissrick v. McPherson, 20 Mo. 310; Lord v.
Siegel, 5 Mo. App. 582; Hanson v. Jones, 20 Mo. App.

601; Hengsgen v. Mulaly, 23 Mo. App. 613; G. S. 1865, ch. 144, secs. 1 and 2; Anderson v. Vollmer, 83 Mo. 403; Milling Co. v. Walsh, 108 Mo. 277; Robinson v. Smith, 111 Mo. 205; Seligman v. Rogers, 113 Mo. 642; Wilcoxen v. Garr, 139 Mo. 660.   (9)   The law lays down the measure of a director's duty, to-wit:   Such care as an ordinarily prudent person would exercise under similar circumstances; the application of the rule to particular facts is for the jury.   Any other practice would require the court in each instance to declare, as a matter of law what is negligence and what is diligence.   After the event, it is easy to determine its cause and to suggest a preventive.   There have been few bank failures—probably none—after which, it could not be easily pointed out that a simple precaution, not thought of before by the most careful, would have prevented the disaster.   If the courts can declare, as a matter of law, that this precaution should have occurred to the minds of the directors and applied in the particular instance, no question of fact can ever arise in such cases.   A jury has no duty to perform in them.   Stone v. Rottman, 183 Mo. 573; Hun v. Cary, 82 N. Y. 78; 10 Cyc. 830; 1 Morawetz on Private Corporations (2 Ed.), sec. 552; Marshall v. Bank, 8 S. E. 590; Mining Co. v. Ryan, 44 N. W. 46; Davenport v. Prentice, 110 N. Y. S. 1056, 198 N. Y. 570; Daugherty v. Poundstone, 120 Mo. App. 307.

## STATEMENT.

The Middleton Bank was incorporated March 13, 1883, with a capital stock of $15,000.   It was closed on the 2nd of May, 1905, under orders of the Secretary of State.   The plaintiff, Charles Lyons, was appointed receiver by the circuit court of Lafayette county, on the 6th of May, 1905, and directed to bring this suit against the board of directors of said bank, who had been elected on April 14, 1904, for one year.   The presi-

dent of the bank having died before the institution of the suit, his executors were made defendants. Another executor having died after the suit was begun, the action was revived against his administrator. These representatives and the remaining members of the board of directors are the defendants to this action. E. H. Lewis, the cashier of the bank, was originally joined as defendant, but no service was obtained on him (he having absconded) and the suit was dismissed as to him. The action was originally in two counts. The second count was dismissed. It went to trial on the first count, which averred the incorporation of the bank and the election of the defendants as its directors, and alleged their failure to take a bond for the faithful performance of the duties of their cashier, E. H. Lewis, and their failure to discharge their duties as directors, in that they negligently failed and omitted to direct, manage, control and watch the affairs and business of the bank as required by law, by reason of which said bank became insolvent and lost during the year of their incumbency of office the sum of $37,650.-71.; that they negligently permitted said cashier during that period to become indebted and liable to said bank for overdrafts in large sums of money, and negligently failed to examine the books of said bank showing such overdrafts; that they negligently employed said cashier, who was a gambler and customer of bucket-shops, which fact they either knew or by reasonable diligence could have ascertained; that from the month of August, 1903, until the closure of the bank, said cashier had been converting the money of the bank to his own use, and at the time the bank was put in the hands of a receiver had embezzled funds in the sum of $78,129.46; that in the accomplishment of this embezzlement, the said cashier made false entries on the books of the bank, showing, among other things, that he had issued drafts for small amounts

when in fact he had issued them for large amounts and cashed the same and converted the proceeds thereof, over and above the small amount for which said drafts were apparently issued, to his own use; that a full dis-closure of these transactions would have been made to the directors if they had not negligently failed and omitted to examine the monthly statements of the cor-respondent banks where the raised drafts were cashed, and had not negligently failed to count the cash on hand and compare the same with the books of the bank, and make an examination or inspection of the accounts of the depositors of the bank; that they neg-ligently failed to adopt any such methods of discover-ing the dishonesty of their cashier and his forgery of the drafts of the bank upon its correspondent banks; that they also negligently permitted the cashier to per-form the duties of president, vice-president, and of every other officer of the bank without any supervision or examination of his transactions in so doing; that the defendants negligently failed to appoint committees to examine and count the cash of the bank, and exam-ine and compare with the books the bills discounted and the property of the corporation, and make an in-ventory of the same, but turned over the exclusive and absolute management and control of said bank to its said cashier.

The petition further set forth, with great partic-ularity, other instances of the negligent failure of the defendants to perform their duties as directors and trustees of the said bank, embracing twenty-nine spec-ifications of drafts drawn by its cashier on funds de-posited in a bank in St. Louis and a bank in Kansas City. As an example of one of these transactions, the petition shows that said cashier, in August, 1904, caused the books of the Middleton Bank to show that draft No. 4426 on its correspondent bank in St. Louis was issued to himself as an individual for the sum of $25 and thereafter filled out so as to show that it

was drawn for $2500; that the latter sum was paid by the St. Louis bank a few days thereafter and due report thereof was forwarded to the Middleton Bank; that in January, 1905, the said cashier caused the books of the said Middleton Bank to show that draft No. 43580 was made upon its correspondent bank in Kansas City, payable to the cashier, for the sum of $10, which draft was afterwards filled out for the sum of $1099.28, and the latter amount was duly paid by the correspondent bank at Kansas City and due report thereof made in its statement subsequently rendered. Wherefore, for these and other matters alleged in the petition, the receiver prayed judgment for an amount embezzled from the bank during the year of the directorate of the defendants in the sum of $37,-650.71.

The defendants filed separate answers—all in the form of general denials.

During the course of the trial, plaintiff offered in evidence entries contained on the books of its correspondent banks in St. Louis and Kansas City, which showed the amounts paid by said banks on the said drafts drawn upon them by the cashier of the Middleton Bank. These books were produced by the respective employees of such correspondent banks, who had kept them and made the entries thereon. The court permitted these entries to be read in evidence, but afterwards excluded them upon the objection made by defendants that the entries were matters of hearsay and incompetent. This ruling of the court was duly excepted to. The entries on the books thus excluded showed the peculations of the cashier as charged in plaintiff's petition. Plaintiff also showed by the books of the Middleton Bank that the cashier was over-drawn during the last year of the bank's operation in the sum of $6657.95. Plaintiff adduced evidence tending to show that the cashier of the Middleton Bank was known to be a trader in options or a patron of

bucket-shops while he was an officer of the bank; that the president of the bank had been notified that it was run as a "one man bank by the cashier." Plaintiff further proved that the correspondent banks of the Middleton Bank in Kansas City and St. Louis returned "reconcilement sheets" each month to the Middleton Bank, which showed the amounts and drafts paid on its account.

The defendants adduced evidence tending to show that they convened monthly in a directors' meeting; that their cashier bore a good reputation in the community, and that they were not actually apprised of his peculations and misconduct.

Other facts as far as necessary will be stated in the opinion.

On the trial, plaintiff had a verdict for $18,955.90, which the court set aside on the ground that "the said verdict is against the weight of the evidence." From that ruling, plaintiff has appealed to this court, and assigns for error the ruling of the court in excluding the entries from the books of the banks at Kansas City and St. Louis, and in setting aside the verdict.

OPINION.

I.

BOND, J. (After stating the facts as above).—The trial court erred in excluding from the evidence the contents of the books of the correspondent banks in

St. Louis and Kansas City. Those

**Record Entries of Correspondent Bank.**

books contained entries of the various drafts drawn upon said banks by the cashier of the Middleton Bank and of the dates and amounts paid upon such drafts. They were made by the two witnesses who produced the books and testified to their contents, who were employees of the correspondent banks and as such made

the entries on their books in the due course of business between them and the Middleton Bank. These books furnished a record at first hand of the course of dealing between the Middleton Bank and its two correspondents.

The law is now well settled, that such book entries are competent evidence of accounts between parties affected thereby. After a full review of the authorities on the subject, Judge BLACK, speaking for the court, reached the conclusion that account books which had always been usable to refresh the memory of the party keeping them where such person was a competent witness, should be admitted in evidence independently and even in favor of the party for whom they were kept, provided such account books were original entries, fair upon their face, and shown to have been kept in the usual course of business, and the entries thereon were concomitantly made with the happening of the facts recorded, and therefore constitute a part of the *res gestae.* [Anchor Milling Co. v. Walsh, 108 Mo. l. c. 284, 285.] The rule thus announced has been constantly adhered to by this court. It has been held to justify the admission in evidence of "prices current, provided they be traceable to reliable sources" as indicative of the state of the market. [Seligman v. Rogers, 113 Mo. l. c. 657.] And the doctrine has been specifically applied to the right of a banker to sustain his action against a debtor by showing the transactions between them as they appeared upon the books of the bank upon which they had been transcribed each day from the checks of the customer and the tickets of the teller and where the accuracy of these transactions was proven by balancing the bank books upon which they were made. [Robinson v. Smith, 111 Mo. l. c. 207.]

In the case at bar, the particular employees of the two correspondents who made the entries on their books testified that these entries were original ones,

made in the usual course of business and as part of their duty and at the time the drafts of the Middleton Bank were presented for payment; that the account shown on the books was accurate and correct in all respects.

Under the foregoing decisions, these books were admissible in evidence, both as aids to the testimony of the parties who kept them and on account of their independent probative force. They were, in legal effect, just as much a record of the transactions of the Middleton Bank as if they had been made in its home office by its own employees. For the right of the correspondent banks to make and keep these records was an essential incident to the business relations between them and the Middleton Bank, and they would have been receivable in evidence on behalf of the correspondent banks in any action which might have been brought to show the amount to which they were entitled to a credit against the Middleton Bank, or as a basis for recovery against it for the sums thus paid upon its request. The record shows that the payments thus made were actually enforced against the Middleton Bank in its settlement of its accounts with its two correspondents. It is, therefore, difficult to perceive under what theory, in the light of the foregoing rulings, the evidence thus furnished of the loss sustained by the Middleton Bank was excluded from the view of the jury in the present action to recover those losses, as having been caused by the neglect of duty and mismanagement of its board of directors. The evidence furnished by these book entries and the testimony of the parties who kept them should not have been withdrawn from the jury. It is not denied that it showed accurately the amount and dates of the embezzlement of its money by the cashier of the Middleton Bank; and in connection with other conversions by him of the property of the bank in the way of overdrafts, it

fully warranted the verdict in plaintiff's favor if the loss to the bank by the wrongdoing of the cashier was caused by the negligence of the defendant directors under the rules prescribed by law for measuring their responsibility as such officers.

## II.

This presents the question as to the nature and extent of the duty imposed upon defendants while acting as directors of the Middleton Bank, and whether they exercised ordinary care or reasonable diligence in the discharge of that duty to prevent the loss to the bank from the misconduct of its cashier. The directors of a bank of deposit and discount (as the one in question) are not only trustees of its assets for the benefit of the bank and its stockholders (Magee on Banks & Banking [2 Ed.], p. 109, sec. 103) but are also responsible managers of its business and operations and invested with full power of selection and appointment of officers and agents to conduct its affairs. The control, supervision and conduct of the business of a bank is lodged in its board of directors as a collective body. The individual directors are not officers of the bank and have no powers individually to control its management. To do this, they must act as a board, in which capacity they have plenary power to act for the bank, subject to the limitations of its charter and the rights of its stockholders. [5 Cyc. 466; Calumet Paper Co. v. Haskell Show Printing Co., 144 Mo. l. c. 338; State ex rel. v. Rubber Mfg. Co., 149 Mo. l. c. 202; Bank v. Hill, 148 Mo. l. c. 389.] While the office of bank director is generally gratuitous, it is never a sinecure.

*Bank Directors: Duties.*

## III.

In a very discriminating discussion of the duties and obligations of directors of a bank, a recent text-

writer has observed that the law views their liability from two standpoints—the first, a rule of minimum liability which regards the matter entirely from the director's side, and according to which he is required to exercise a general supervision and "fulfill a few specific statutory requirements, but not much more. It is not expected that he will devote much time to the affairs of the bank, as he is rarely paid anything for his services, and generally is engaged in other and far more important business. It is not reasonable to expect that he will examine the books and other records, and without doing these things he cannot know much about the details of the bank's affairs and this is supposed to be known by all who do business with banking institutions." [1 Bolles' Modern Law of Banking, p. 278, sec. 24 et seq.] The author then refers to what is termed "the maximum rule," and speaks of it as follows: "The other rule regards the duty and liability of directors from the public side," and in stating this rule he says: The following language of Justice EARL is "more often quoted with approval than any other legal deliverance," to-wit:

"It seems to me that it would be a monstrous proposition to hold that trustees, intrusted with the management of the property, interests and business of other people, who divest themselves of the management and confide in them, are bound to give only slight care to the duties of their trust, and are liable only in case of gross inattention and negligence; and I have found no authority fully upholding such a proposition. It is true authorities are found which hold that trustees are liable only for *crassa negligentia,* which literally means gross negligence; but that phrase has been defined to mean the absence of ordinary care and diligence adequate to the particular case. . . . Like a mandatary, to whom he has been likened, he is bound not only to exercise proper

*Degree of Diligence.*

care and diligence, but ordinary skill and judgment. . . . These defendants voluntarily took the position of trustees of the bank. They invited depositors to confide to them their savings, and to intrust the safe-keeping and management of them to their skill and prudence. They undertook not only that they would discharge their duties with proper care, but that they would exercise the ordinary skill and judgment requisite for the discharge of their delicate trust."

The writer, after a thorough discussion of the views of the courts of the various States from the two standpoints, concludes that the rule quoted above (from the opinion of Mr. Justice EARL, Hun v. Cary, 82 N. Y. 65) "commands much wider assent and is believed to be more salutary in its operation." [1 Bolles on Modern Law of Banking, p. 294 et seq., citing authorities in support of his conclusion from sixteen States, including Missouri. Union National Bank v. Hill, 148 Mo. 380; Stone v. Rottman, 183 Mo. 552, 580.]

We approve the conclusion thus stated. The principles underlying it were also applied in a decision of Chancellor PITNEY, now justice of Supreme Court of the United States, in a case quite the same as the one under review, as to the practice of the cashier in drawing funds out of a depository on drafts exceeding the sums for which they were entered on the books of his own bank. Said the court as to this plan:

"The first entry of each of these transactions on the books of the bank was made by the cashier on the stub of the draft. Of course, if honestly made, those entries should correspond with the amount of the draft; but, when desiring to borrow or steal, he drew a draft for one amount and entered a less amount on the corresponding stub, and appropriated the difference to his own use. This appropriation was effected by actually drawing the cash from the Park Bank.

In these instances nothing was taken from the cash drawer of the insolvent bank.'

"The amount so entered on the stub was, with the stub number, entered, with the other drafts drawn on each day on the Park Bank, on a blotter kept by the bank, and the sum of these items credited to the Park Bank in one item for that day. The result was that the theft could not be discovered by an examination of the books of the insolvent bank, which were complete in their character and well kept, nor by a count of the cash, which would not be affected by these entries.

"But the Park Bank, at the end of each calendar month, in accordance with the usual custom in such cases, made up a balance sheet or transcript of its account with the insolvent bank, more properly called an account current, upon which each of these drafts was entered, with its number, and forwarded the same, with the vouchers, to the insolvent bank. These transcripts, or accounts current, and vouchers were all preserved and found at the bank by the receiver. No examination of these balance sheets or comparison thereof or of the vouchers with the books of the insolvent bank was ever made by any person, except the cashier. The duty of making this examination was cast entirely upon him; and, so far as appears, no inquiry was ever made as to any possible discrepancy in these accounts.

"That the very first of these thefts would have been discovered if a simple comparison of the two accounts, item by item, had been made each month, is too clear for argument. It was hardly denied by counsel for defendants." [Campbell, Receiver, v. Watson, 62 N. J. Eq. 1. c. 410, 411.]

The learned judge preliminary to the above statement of the facts announced the following observations as to the duties imposed by law on bank directors:

"Their names give credit and standing to the institution, and are a guarantee to dealers that its af-

fairs will be conducted with reasonable prudence and care and according to law. They are, in my opinion, bound to acquaint themselves with the extent and mode of supervision exercised by officers of well-conducted banking institutions in the neighborhood. · I cannot yield to the suggestion of some of the defendants' counsel that the fact that the institution in question was a small country bank relieved its directors from adopting the same practical measures for protection against frauds and thefts as were in use by its greater neighbors in the larger towns.

"Another observation is that the directors cannot be held liable for a mistake in an honest judgment upon matters properly mere matters of judgment, as distinguished from matters of administration. In matters of administration, where a duty to perform certain functions devolves upon them, they are justly held liable either for their nonperformance—nonfeasance—or for their lack of ordinary diligence in their attempted performance, whereby loss is incurred. By 'ordinary diligence' I mean such as is exercised by other prudent and diligent officers under like circumstances. What degree of diligence is reasonable, in the concrete, will be considered in connection with the specific acts of negligence upon which complainant relies." [Campbell, Receiver, v. Watson, supra.]

All of which are in complete harmony with the rulings in this State when a suit is brought by a bank or its receiver or assignee. [183 Mo., supra; 148 Mo., supra; Thompson v. Greeley, 107 Mo. l. c. 590.]

The differentiations of slight, ordinary and gross negligence noted at common law and in the law merchant are no longer adhered to in the Missouri decisions. [Young v. Railroad, 227 Mo. 307; Magrane v. Railroad, 183 Mo. 119; Reed v. W. U. Tel. Co., 135 Mo. 661; McPheeters v. Railroad, 45 Mo. 22.] The reason is, that an analysis of the cases will demonstrate that the practice of any of these degrees of negligence

is at least the absence of ordinary care and diligence if not the want of a higher degree of care and diligence, and is therefore always actionable when directly causing injury. If the circumstances are such on account of their simplicity and fewness as to require slight care, then the failure of that duty is none the less the failure of ordinary care and diligence, for that obligation the law postulates in every. case though it sometimes demands a higher duty, as in the case of carriers or owners of dangerous agencies. Likewise, where the facts of the transaction are complex and various, and for that reason require more attention and greater care than in the case first supposed, still the failure to observe these duties (barring exceptions noted) is only the absence of ordinary care and diligence, which is the elastic standard created by law upon the logic of the particular facts of each case. It follows that the sole criterion in ordinary actions for negligence like the one in hand, is whether the persons sought to be charged acted with ordinary care and reasonable diligence in view of the facts and circumstances of the given case, and that this obligation, though necessarily varying according to the particular facts, is one in principle and reason. The terms in question mean the duty of care equal to the occasion, and, hence, due and adequate care and diligence at all times. When this is shown, no liability accrues in actions like the one under review. When it is not practiced, then full responsibility attaches whether the negligence thereby resulting might have been previously termed slight, ordinary or gross. For every kind of negligence is actionable which is the converse of the duty of ordinary care and reasonable diligence and is the proximate cause of injury to another. The law assumes this to be a reasonable standard of conduct and has generally defined it by the terms, ''that care or diligence which an ordinarily careful or prudent person would exercise under the same or similar circumstances.''

## IV.

In addition to the general rules of law governing the duty of a board of directors, the statutes of this State contain the following provisions in reference to banks of deposit and discount, which, as far as relevant to this case, are, to-wit:

Sec. 1099, R. S. 1909: "The affairs and business of the corporation shall be managed by a board of directors or managers, consisting of not less than three nor more than twenty-one shareholders, who shall be elected annually. . . . The board of directors of each and every bank organized under this article shall meet at least once per month and pass upon the business of the bank back to the previous meeting of the board, and shall keep a written record of its approval or disapproval of each and every loan, and at each monthly meeting the records shall show the aggregate of the then existing indebtedness and liability of each of the directors and officers of the bank, and no bills payable shall be made and no bills shall be rediscounted by the bank, except with the consent of the board of directors."

And the further section, to-wit:

"Sec. 1112. The directors may appoint and remove any cashier or other officer or employee at pleasure. . . . The president, cashier, assistant cashier, or any other officer, upon whom the powers of a cashier may be imposed by the board of directors, before entering on the duties of their office, shall give good and sufficient bonds, which shall be approved by the board of directors, in writing, on the records of the board, upon which bonds no member of the board of directors shall become a surety, in such sum and with such number of sureties as the board may direct, conditioned that they will well and faithfully perform all the duties of their office, and that they [the sureties] will hold the bank harmless for any loss occasioned by any act

of such officer, until all his accounts with the bank shall have been fully settled and satisfied, such bond to be deposited in some safe place inaccessible to the maker thereof or the sureties thereupon.''

In speaking of the obligations of a board of directors to perform duties imposed by statute, it is said:

''It is their duty to know the express provisions of the statute which define their power, and for a violation of all such acts however committed by them, they will be held liable.'' [Magee on Banks and Banking (2 Ed.), p. 123.]

And on this subject, this court has announced the rule, to-wit:

''Under the provisions of the statute investing in a board of directors the management of the affairs of a banking corporation, the members of the board occupy a fiduciary relation to the stockholders, creditors and depositors, which demand of them careful attention, good faith and honest management. As is said in Louisville Nat. Bank v. Loving, 82 Ky. 370: 'By reason of the trustee character of the bank, the great facilities its officers have for committing frauds, the inability of the public to know its condition, and the supreme control the directors have over its affairs, it becomes the duty of the latter to so conduct the business that any misconduct cannot long continue. The banks transact the business of the country so largely, and those dealing with them are compelled to rely on their officers so implicitly, that the extraordinary privileges accorded to them should be properly exercised.' For a failure to discharge these important trusts they become liable at the suit of the corporation for losses to the corporate assets thereby sustained. [Bent v. Priest, 86 Mo. 482; Slattery v. Trans. Co., 91 Mo. 217; Ward v. Davidson, 89 Mo. 445; Hodges v. Screw Co., 1 R. I. 312; Smith v. Hurd, 12 Metc. 371; Attorney-General v. Ins. Co., 2 Johns. Ch. 371; Thompson on Liability of Officers, 376; Cogswell v. Bull, 39 Cal. 320;

Ins. Co. v. Jenkins, 3 Wend. 130; Hun v. Cary, 82 N. Y. 70; Mining Co. v. Ryan, 42 Minn. 198.]

"A receiver of an insolvent corporation succeeds to the title of the property and rights of action of the corporation, when so invested by statute, or by the decree of the court appointing him, and is the proper party to a suit to enforce them by legal proceedings. If a right of action against these directors existed in favor of the corporation, this action is properly prosecuted in the name of the receiver. [Alexander v. Relfe, 74 Mo. 516; Gill v. Balis, 72 Mo. 424; High on Receivers, sec. 316; Thompson, Liability of Officers, 377, and authorities cited by each; Morse on Banks and Banking, sec. 129; Hun v. Cary, supra.]" [Thompson v. Greeley, 107 Mo. l. c. 589-590.]

Applying the foregoing rules of law and statutory provisions to the defendants under the facts shown by this record, it appears that during the time the defendant directors held their offices, the cashier of the Middleton Bank, E. H. Lewis, was engaged in gambling deals with keepers of certain bucket-shops; that to get money for this purpose, he had appropriated the funds of the Middleton Bank by overdrafts of his personal account, amounting to over $6000, and also by making fraudulent drafts upon two of its depositories —a bank in St. Louis and a bank in Kansas City; that in so doing it was his habit to note on the bank register book of the Middleton Bank, that a draft had been drawn upon one of these correspondents for a trifling or insignificant sum, and thereafter to fill out the draft for a sum in many cases involving thousands of dollars; that upon the payment of such drafts, the cashier would appropriate to himself the excess of the amount paid on such drafts over and above the amount which he had falsely recorded on the books of the Middleton Bank. His misappropriation in this manner added to the amount of his overdrafts exceeded the amount for which the plaintiff obtained judgment

in this case. The aggregate amount of his embezzlement by both methods is undisputed. The whole extent and nature of the wrongdoing of the cashier might have been discovered by the defendant directors if they had examined at their monthly meetings the state of his personal account and had also caused to be submitted to them or to a committee appointed by them, the monthly return statements, called "reconcilement sheets," made to the Middleton Bank by its two correspondent banks in St. Louis and Kansas City, which showed the amount which such depositories had paid out during each month upon the drafts drawn upon them by the cashier of the Middleton Bank. It is conceded that no such examination was had or caused to be made by the defendant directors. Their neglect in this respect was a clear violation of the duties imposed upon them by the general law as well as by the statutes of this State. The failure of the defendants to comply with the aforesaid statutory duties was negligence in and of itself as a matter of law, and rendered them liable for all losses thereby caused, independently of the neglect on their part of the nonstatutory duty to exercise in the governance and control and watchfulness of the business of the bank, ordinary care and diligence or that degree of care, diligence and skill demanded by the particular nature of the business intrusted to their management—in other words, care equal to the occasion. The statute, supra, made it the positive duty of the board of directors "to pass upon the business of the bank every month and to have at each meeting a record showing the then existing indebtedness and liability of each of the directors and officers of the bank." Had this duty been performed, the indebtedness of the cashier would have been necessarily disclosed at every monthly meeting of the bank during the year for which defendants held office. They wholly disregarded this specific requirement of the statute, as they did the further special requirement of

the statute making it their duty to compel the cashier to give the bond therein specified.

Except for these acts of negligence, the Middleton Bank could not have been defrauded of the aggregate amount of over $37,000, which the record shows was misappropriated in the manner aforesaid by the cashier during the term of office of the defendants. The amount of these conversions being a mere matter of computation and undenied by the defendants, and the responsibility of the negligent directors therefor being a mere legal conclusion, it necessarily follows that a verdict in their favor by the jury would not have been permitted to stand. The law is well settled in this State, that where a trial judge exercises his discretionary power of setting aside a judgment on the ground "that it is against the weight of the evidence," his action in so doing will not be reviewed except upon a showing that no verdict in favor of the party to whom the new trial is granted would be allowed to stand. In which event, the exercise by the trial court of his power to grant a new trial although put upon a discretionary ground, is deemed to be unjudicial, and it is the duty of this court to reverse his ruling in that respect. [Foley v. Harrison, 233 Mo. l. c. 507, 508; Smoot v. Kansas City, 194 Mo. l. c. 532; Casey v. Transit Co., 186 Mo. l. c. 232; Fitzjohn v. Transit Co., 183 Mo. l. c. 78, 79, 80.]

Under the record in this case and upon consideration of the undisputed facts and the documentary evidence afforded by the books of original entries made by the correspondent banks at St. Louis and Kansas City, setting forth the amounts paid by them upon the forged drafts of the cashier, no verdict for the defendants could have been legally permitted to stand. The amount recovered by plaintiff was within the sum which he was entitled to recover in this case.

The order of the trial court granting a new trial for the reason given is, therefore, set aside; and the cause remanded with directions to reinstate the verdict in favor of the plaintiff as of the date upon which it was rendered.

PER CURIAM.—The foregoing opinion of BOND, J., in division is adopted as the opinion of the Court in Banc. *Graves* and *Bond, JJ.,* concur *in toto; Lamm, C. J., Brown* and *Faris, JJ.,* concur in separate opinion of FARIS, J.; *Woodson* and *Walker, JJ.,* dissent.

## CONCURRING OPINION.

FARIS, J.—I concur most heartily in the result reached upon the facts in judgment in this case by my learned associate, Judge BOND, but I note certain language in paragraphs 3 and 4 of his opinion, which, whether he has so intended it or not, may give rise to the view that he has held bank directors to be insurers, so far as concerns the duty owed by them to the bank's depositors. With such holding I cannot agree.

The flagrant lack of diligence on the part of the defendants here, has, it may well be, so aroused the just condemnation of my learned brother, as to cause him *dum opus fervet,* to put his thoughts in language as strong as his disapprobation and thus to pass beyond the view which judicial caution and the orderly and practical conduct of the banking business seem to my mind to compel us to take.

For example, the majority opinion says:

"The terms in question (i. e., the term 'ordinary care' as applied to the duty owed by a bank director) mean the duty of care equal to the occasion, and, hence, due and adequate care and diligence at all times. When this is shown, no liability accrues in actions like the one under review. When it is not practiced, then full responsibility attaches whether the negligence thereby

resulting might have been previously termed slight, ordinary or gross."

If my learned associate means by this language only that duty which he proceeds to express in his next sentence but one, following, to-wit:

"The law assumes this to be a reasonable standard of conduct and has generally defined it by the terms, 'that care or diligence which an ordinarily careful or prudent person would exercise under the same or similar circumstances.'"

then I most cordially agree with him; but if he means that a director of a bank must exercise such degree of care as at once, or inevitably, to detect or prevent theft and peculation on the part of the bank's managing officers, or failing therein, respond in damages, I cannot agree.

The various grounds upon which liability of a bank director accrues are collated from the authorities and are thus stated in 5 Cyc. 480:

"The liability of directors is in many cases prescribed by statute or charter, and is not extinguished by its expiration; but unless so fixed (i. e. by statute, constitution or charter) the act must in some way possess an element of fraud (Fusz v. Spaunhorst, 67 Mo. 256), or show the lack of knowledge they ought to have possessed when accepting office (Godbold v. Bank, 11 Ala. 191; Delano v. Case, 121 Ill. 247; Jones v. Johnson, 86 Ky. 530; Commercial Bank v. Chatfield, 121 Mich. 641; Union Bank v. Hill, 148 Mo. 380; Dykman v. Keeney, 154 N. Y. 483; Swentzel v. Penn Bank, 147 Pa. St. 140; Briggs v. Spaulding, 141 U. S. 132; Fisher v. Parr, 92 Md. 245). The essential taint of fraud or abuse of trust may consist of the continued employment of officers who are known to be speculating, or otherwise absorbed primarily in their own personal affairs to the known detriment of those of the bank (Prather v. Kean, 29 Fed. 498; but see, Brannin v. Loving, 82 Ky. 370, where it is said that a single wrongful

act of the president is not sufficient to charge directors
with negligence) ; of not making the returns or reports
required by the State, or of knowingly making incor-
rect ones; of making false representations concerning
their bank's condition with the view of selling their
stock to better advantage or attracting business; of
making fraudulent issues and sales of stock; of receiv-
ing deposits when their bank is in an insolvent con-
dition (Cummings v. Winn, 89 Mo. 51) ; of making
fraudulent representations of its solvency to depositors
and misleading them; or of lending more money than
the law will permit to a borrower (Banks v. Darden,
18 Ga. 318; Thompson v. Greeley, 107 Mo. 577).''

In consonance with the view that the liability of a
bank director to a creditor accrues, in the absence of
fraud or malice, not from the common law but by vir-
tue of a statute, or from a provision in the organic
law (Cummings v. Winn, 89 Mo. 51), or as the text
quoted says, by virtue of the bank's charter, our own
court has said in the case of Fusz v. Spaunhorst, 67
Mo. l. c. 264:

''Aside from statutory provisions or one of similar
nature in the organic law, the directors or officers of
an incorporated bank would not be individually re-
sponsible in an action at law, for injury resulting to a
creditor or depositor, unless the injury were occa-
sioned by the malicious or fraudulent act of the party
complained of.''

Aside then from fraudulent or malicious acts,
under our statutory provisions and by our Consti-
tution, the duty deduced as imposed upon a director of
a bank, is the duty of exercising the same degree of
care which an ordinarily careful or prudent person
would exercise under the same or similar circumstan-
ces. This does not mean an ordinarily careful or pru-
dent expert in figures, or an ordinarily careful or pru-
dent professional accountant, but it means the ordi-

narily careful and prudent man, such as the usual bank directorates in city and country are made up of.

This was the holding of this court in the very last case in which the liability of a bank director was up for discussion and ruling. [Stone v. Rottman, 183 Mo. 552.] In that case we said:

" 'The director of a bank is only required to act in good faith and to exercise such a degree of care as a reasonably prudent man would exercise under the same circumstances. He is not bound to exercise the same degree of care which a prudent man would exercise in his own business. This is too high a standard. "To expect a director, under such circumstances, to give the affairs of the bank the same care that he takes of his own business, is unreasonable, and few responsible men would be willing to serve upon such terms. In the case of a city bank, doing a large business, he would be obliged to abandon his own affairs entirely. A business man generally understands the details of his own business, but a bank director cannot grasp the details of a large bank without devoting all his time to it, to the utter neglect of his own affairs." [Swentzel v. Penn Bank, 147 Pa. St. 140.]' "

I am willing to go even farther than this, and I think we ought to go as far as to hold unequivocally, that while a director of a bank is not required to exercise about the bank's business the same amount of care, i. e., devote the same amount of time thereto, which he devotes to his own affairs; yet that is so only in the matter of degree or in time expended. He ought not to perform his duties perfunctorily, nor beg the question by assuming as a major premise that identical honesty of the bank's officers which his office makes it his duty to investigate. In other words, when he is about the bank's business, when he is performing his statutory duties of "passing upon the business of the bank" (Sec. 1099, R. S. 1909), he ought to be held to a degree of care at least equal to that which an ordi-

narily careful and prudent person would under similar circumstances exercise in his own personal business. This for the reason, if no other, that he is the trustee and agent of the bank, which bank is the debtor of its depositors. [Utley v. Hill, 155 Mo. l. c. 259.] The funds of the bank of which the director is the conservator, bear the same relation to the depositors of the bank as the property of the director himself bears to the creditors of the director. Why then should the director, when actually engaged about the affairs of the bank, not exercise the same degree of diligence in the one case as in the other? He cannot be expected— serving as he does, in most cases without compensation—to devote the same amount of time to the bank's business that he does to his own personal affairs; but at such times as the statute requires him to look after the bank's business, and in the manner, degree and thoroughness with which he performs these duties enjoined upon him by statute or by the Constitution, no reason for any distinction as between the degrees of care with which he looks, or should look, to his own affairs and that with which he looks to those of the bank, can be seen. And the general duty of exercising that degree of care which an ordinarily careful and prudent person would exercise under similar circumstances is perennial and follows him ever. If he cannot, unless hindered by an act of God, give this attention and this degree of attention to his duties, he owes it to the bank's depositors to resign, or take the consequences.

Subject to this view, the case from which I quote above (Stone v. Rottman, supra), well expresses some of the director's duties, his limitations and the reasons therefor, and the prescience with which the Legislature acted when it made the statute. Thus:

" 'A director is expected to attend the meetings of the board with reasonable regularity and to exercise a general supervision and control. He is not required

to know the details or contents of the books and papers. "The framers of the organic and of the statute law must be held to have understood how the business of a bank is conducted. They must have known that the directors are drawn from the busiest men in the community; men who have carved success out of chaos, who have succeeded where the great multitude have failed; men who are not expected, and could not afford, to give their whole time to the business of the bank. The lawmakers knew that the active management of a bank usually devolves upon the president and cashier, and that to the latter is usually entrusted the management of the details. They know that few directors had the time, and fewer still the capacity, to examine the books of a bank and ascertain its solvency; that even in their own business they could not take off a trial balance from the books they employed experts to keep for them, either because they had not the time to do so for themselves or because they did not have the capacity to do so." [Utley v. Hill, 155 Mo. l. c. 265; Queen v. Hincks, 10 Cent. L. J. 127 (cited in Thompson on Liability of Agents, etc., p. 477); Dunn v. Kyle, 14 Bush (Ky.), 134; Savings Bank v. Caperton, 87 Ky. 306.]' "

Nor do I think the statute quoted by my learned associate uses the term "existing indebtedness and liability," in the exact sense suggested by him. If either the word "indebtedness" or "liability" means a debt or liability arising out of the tort, that is, the thefts or embezzlements of the cashier or managing officers, then the effect of this section is to make the directors insurers. The statutory language used, neither by its terms nor by the setting in which it is found, will in my view bear so harsh and far-reaching a construction. The compelling verbiage is: "The board of directors . . . shall meet at least once per month and pass upon the business of the bank back to the previous meeting of the board, and shall keep a

written record of its approval or disapproval of each and every loan, and at each monthly meeting the records shall show the aggregate of the then existing indebtedness and liability of *each of the directors* and officers of the bank.'' It will be noted that the ''indebtedness and liability'' of the directors themselves, though *they possess scant if any opportunity to steal or embezzle,* and *none to falsify the bank's books,* is yet required to be entered upon the records of these monthly meetings *just as, and along with,* the indebtedness and liability of the president, cashier or other active managing officer, who has full opportunity to steal and embezzle. Evidently the word liability is *ejusdem generis* with indebtedness, and evidently the records upon which such indebtedness and liability are to be set down, are the minutes required to be made in the corporation's journal of proceedings, so that he who runs may read and, reading, see that the indebtedness and liability of no director or officer is ''in excess of ten per centum of the capital and surplus'' of the bank which is forbidden by a subsequent provision of the self-same section 1099. In the instant case the defendants as directors set down in their records such several indebtednesses of themselves and of the cashier, but they did not set down the cashier's indebtedness as the books of the bank upon their face patently showed it to be, though this is all that the statute quoted requires in this behalf. For, I labor to show that the indebtedness and liability required by this stat-. ute to be shown upon the director's records means debts accruing in the natural and ordinary course of business as contradistinguished from those growing out of torts builded upon thefts and embezzlements uniformly hidden, usually with much of criminal ingenuity. To the acts of the defendants here, as to the acts of all bank directors *in passing upon the business of the bank, and in setting down the indebtedness of themselves and the officers of the bank,* I apply, without the abatement of

)

jot or tittle, the salutary rule exacting a diligence equal to that which an ordinarily careful or prudent man would exercise under the same or similar circumstances in his own personal business affairs. But I go no farther. And this is, to the extent and in the manner I point out above, just a little farther than any other court in any other jurisdiction has ever gone before.

So limiting the opinion of my learned associate in the behalves mentioned, I concur in the result which he reaches. *Lamm, C. J.,* and *Brown, J.,* concur in the views expressed herein.